UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

LAMBROS VASSILIOU,

                    Plaintiff,              **MEMORANDUM & ORDER**
                                            18-CV-0779(EK)(VMS)

          -against-

THE CITY OF NEW YORK, POLICE
DETECTIVE PHILIP VACCARINO, POLICE
DETECTIVE VINCENT AGOSTINO, et al.,

                    Defendants.

-------------------------------------x

ERIC KOMITEE, United States District Judge:

          This case concerns allegations of police misconduct in
connection with the arrest of Plaintiff Lambros Vassiliou.
Plaintiff, through counsel, brings thirteen claims under
42 U.S.C. § 1983 and state law against the City of New York and
the six NYPD officers referenced in this Order.  Defendants move
for summary judgment on all claims except for the Section 1983
claim against the two officers involved in Plaintiff's initial
stop, and his negligence claims against all Defendants.  For the
reasons explained below, Defendants' motion is granted in full.
The unlawful-stop and negligence claims, however, will proceed.

                    **I.   Background**

          Plaintiff was searched, arrested, and charged with
prescription-drug-related offenses that were later dismissed.
He alleges that the Defendants violated the Constitution at

1

nearly every stage of the process, from the initial traffic stop to his ultimate prosecution.

The following facts are derived from Plaintiff's deposition testimony, unless otherwise noted.  On November 12, 2016, police officers Philip Vaccarino and Jelson Goyco pulled Plaintiff over as he was driving his two children to his sister's house.  The purported reason for the stop was that Plaintiff's car — one of the four original models of the "KITT car" used in the 1980s television show Knight Rider — was "observed [with] temp NYS reg and CA plate on car."  Pl.'s Ex. D at 1, ECF No. 54-4 ("Controlled Substance/Marihuana Data Sheet").  At his deposition, Plaintiff explained that the car was specially registered as a "movie vehicle" in California, but not in New York.  Pl.'s Ex. B at 38:9-20, ECF No. 54-2 ("Pl.'s Dep.").  It bore a "movie plate" on the rear that appeared the same as a regular California license plate.  *Id*. 38:4-7; 38:21-39:1.

Once stopped, the officers witnessed Plaintiff "grab a pill bottle from on the center armrest and place [it] into [his] coat pocket."  Pl.'s Ex. D, Controlled Substance/Marihuana Data Sheet at 1.  Plaintiff denies this.  When the officers arrived, however, they asked Plaintiff to step out of the vehicle, and it is undisputed that Plaintiff cooperated.

Plaintiff joined Officer Goyco behind the car, where Goyco asked him whether he had any guns, heroin, or prescription pills on him.  Plaintiff replied that he had prescription medications but nothing else.  When Officer Goyco asked "can I see them," Plaintiff replied "sure."  Pl.'s Ex. B, Pl.'s Dep. at 52:12-19.  Plaintiff then reached into his coat pocket and presented three items, which were all prescribed to him: a prescription asthma pump, and two pill bottles — one of which was for suboxone pills (a pain reliever prescribed for Plaintiff's recent throat cancer surgery).  *Id.* 52:22-25.  The pill bottle labeled for suboxone pills, however, contained twenty-one suboxone strips as well.  Defs' Ex. J at 1, ECF No. 50-10 ("NYPD Property Clerk Invoice"); *but see* Defs' Ex. D, Controlled Substance/Marihuana Data Sheet at 1 (stating that this pill bottle was "unlabeled").  Suboxone contains buprenorphine, which is a controlled substance.  Plaintiff did not present a prescription for the suboxone strips, though he contends that the officers did not ask for one.  Pl.'s Rule 56.1 Statement at 4-5, ECF No. 53.

These pill bottles led to Plaintiff's arrest.  After Plaintiff handed the pill bottles to Officer Goyco, Goyco opened each bottle and then returned them to Plaintiff, who placed the medications back in his coat pocket.  Pl.'s Ex. B., Pl.'s Dep. at 53:16-23.  When asked, Plaintiff told Officer Goyco that the

3

medicines were his, as the name on the labels indicated.  *Id.*
55:1-8.  After an exchange with Officer Vaccarino, Officer Goyco
then reached into Plaintiff's pocket, removed the pill bottles,
and arrested him — all without explanation.  *Id.* 55:25-56:6.

After handcuffing him, the officers contacted their
supervisor, Sergeant Paul Farella, to relay the circumstances of
the arrest.  Two unmarked vehicles — a police van and a sedan —
containing Officers Farella, Leonid Shatkin, Vincent
Setteducato, Vincent Agostino, and Michael Fahmy (not a
Defendant), arrived moments later.  Pl.'s Rule 56.1 Statement at
¶ 26, ECF No. 53.  Sergeant Farella, as the supervising officer,
approved the arrest when he arrived.

Some of these officers "antagoniz[ed]" Plaintiff after
he was handcuffed.  Pl.'s Ex. B, Pl.'s Dep. at 62:21-25.  While
Plaintiff's ex-wife picked up his children, one officer told
Plaintiff, "[W]e are taking your car, man.  We're gonna have
some f--king fun with that."; another officer replied, "No, I'm
going to drive it.  I'm going to drive it."  *Id.* 59:10-21;
62:21-25.  Before departing, Plaintiff observed the police
officers "going through [his] car with no permit."  *Id.*
69:12-16.

According to Plaintiff, his "abuse" continued after
the officers placed him in the back of the police van.  Compl.
¶ 51, ECF No. 31.  Its rear compartment, where Plaintiff sat,

4

contained two long benches on either side.  Pl.'s Ex. B, Pl.'s
Dep. at 65:17-24.  The officers placed Plaintiff on one of the
benches and fastened his seatbelt.  This seatbelt, Plaintiff
claims, was merely for "cosmetics."  *Id.* 66:19-22.  It dangled
loosely across the bench with "no tension" to restrain him.  *Id.*

        With his hands cuffed behind his back and no
restraints to his front, Plaintiff claims Officers Setteducato
(driver) and Shatkin (passenger) gave him a "rough ride."  They
did so for approximately three hours.  Defendants testified,
however, that this timeline is standard procedure — namely, that
it is "common" to complete a scheduled patrol even after
detaining someone in their vehicle, even for three or more
hours, and that there was no "specific reason" why this happened
to Plaintiff in particular.  Defs' Ex. G at 21:22-25; 44:23-
45:19, ECF No. 50-7 ("Setteducato Dep.").

        Plaintiff reported medical issues early in the ride.
The first was his blood pressure.  He told Officers Setteducato
and Shatkin that he needed his "blood pressure medicine" in
light of a heart attack he had suffered two years earlier.
Pl.'s Ex. B, Pl.'s Dep. at 71:6-25 (telling the officers, "I
need my blood pressure medicine or I'm going to pop because I
had a heart attack in 2014," and that he could "run the risk of
having a stroke").  The officers complied with his request.
They stopped their patrol to retrieve Plaintiff's blood pressure

medicine (amlodipine) from Sergeant Farella and then administered the pills to Plaintiff before continuing on.

This is when the officers began driving "really, really aggressively." *Id.* 73:22-74:4.  Shortly after arresting another suspect, Officer Setteducato activated the van's sirens and turned suddenly to pull someone else over.  *Id.* 74:20-75:12. Although Officer Setteducato told him to "hang on," Plaintiff went "flying."  *Id.*  He struck the right side of his face, neck, and shoulder; he had trouble getting back up, and rolled helplessly for five to ten minutes.  *Id.* 75:23-56:2; 77:18-23; 79:5-10.  All told, Plaintiff fell two more times.  *Id.* 75:20-21.  After one fall, he told the officers, as he did "multiple times that night," that "something's not right." *Id.* 78:5-8.  But they "talk[ed] him out of going to seek medical attention."  *Id.* 78:24-79:1.

The officers booked him at the 121st Precinct, where they took his photograph.  *Id.* 80:3-13; 83:3-6.  The photographs show no visible injuries to his head or neck.  Defs' Ex. I at 1, ECF No. 50-9 ("NYPD Mugshot Pedigree").  Plaintiff testified that the Defendants ignored another request for medical assistance at this precinct, though his testimony on this point was inconsistent.  *Id.* 88:20-89:19; *but see id.* 82:2-9 (when asked whether he requested medical attention at the 121st Precinct, Plaintiff stated that he "requested medical attention

in the van and then I requested medical attention again when we stopped at the [second precinct]"); *id.* 91:11-14 (testifying that the second time he asked for help was "after I tipped over [in the van], after they gave me the medication at the 121st [P]recinct"). Plaintiff's pleadings and testimony are somewhat vague as to the nature of these requests, but he asserted that he was concerned about his blood pressure and the injuries he sustained in the van. *Id.* 90:20-91:5.

After "at least two hours" at the first station, the same officers drove him to the second — the 120th Precinct, where he would stay overnight. *Id.* 81:23-82:1. On that drive, one of the officers resumed the conversation about Plaintiff's KITT car. He asked questions about it, such as how much it would cost to buy, before leaving Plaintiff at the next stationhouse. *Id.* 86:23-87:5.

Plaintiff testified that he made another request for medical assistance, though his deposition testimony is inconsistent regarding when he did so. *See id.* 82:2-6 (he "requested medical assistance" "in the van" and "again" "at the 120[th Precinct]"); *id.* 91:15-19 (he requested medical assistance "on the way to the 120th Precinct"); *id.* 90:8-10 (he requested medical assistance "when we were in the 120, but not in the van"). He did not testify as to what medical assistance he requested.

After Defendants left him at the 120th Precinct overnight, he told an unidentified person there that he "d[idn't] feel well" and wanted "medical attention," but again was ignored.  *Id.* 90:12-14.  Plaintiff acknowledges, though, that he did not tell his lawyer about any medical issues when they spoke the next morning.  *Id.* 93:14-18.

Plaintiff was arraigned around noon the next day.  He was charged under N.Y. Penal Law Section 220.03 (Criminal possession of a controlled substance in the seventh degree)[1] and N.Y. Public Health Law Section 3345 (Possession of controlled substances by ultimate users [outside] original container).[2] Officer Vaccarino transmitted the arrest paperwork to the Richmond County District Attorney's Office.  Pl.'s Ex. F, ECF No. 54-6 ("Misdemeanor Complaint and Supporting Deposition"). The judge released Plaintiff on his own recognizance; all charges were later dropped on motion of the prosecution.  Pl.'s

---

[1] Section 220.03 provides that "[a] person is guilty of criminal possession of a controlled substance in the seventh degree when he or she knowingly and unlawfully possesses a controlled substance. . . .  Criminal possession of a controlled substance in the seventh degree is a Class A misdemeanor."

[2] Section 3345 provides that:

Except for the purpose of current use . . . it shall be unlawful for an ultimate user of controlled substances to possess such substance outside of the original container in which it was dispensed.  Violation of this provision shall be an offense punishable by a fine of not more than fifty dollars.

Ex. N, ECF No. 54-14 ("Criminal Court Certificate of Disposition").

Plaintiff reported that the aftermath of his arrest was severe, both medically and emotionally. Plaintiff's ex-wife applied for an order of protection. He lost custody of his children, and their relationship has never recovered. The medical consequences, he claims, were also "unbearable." Pl.'s Ex. B, Pl.'s Dep. at 113:17-21. But the medical evidence is somewhat less clear.

According to Plaintiff, the impact he sustained in the back of the van caused serious complications that surfaced over a year later. *Id.* 106:3-9. When he got home, he noticed swelling in his shoulder, neck, and back. *Id.* 102:2-7. Four days later, he visited a walk-in orthopedic clinic. *Id.* 103:7-10. Following x-rays, the doctors noted he had a "right shoulder injury[,] possibly a rotator cuff tear and right wrist sprain." Defs' Ex. A at 2, ECF No. 50-1 ("November 17, 2016 Medical Records"). They did not prescribe medication, but gave him a "carpal tunnel brace for his wrist," and suggested "some therapy for the shoulder." *Id.* This is the only diagnosis in the record. After this, Plaintiff stated that he received physical therapy sessions from his girlfriend (who had some training in physical therapy). Pl.'s Ex. B, Pl.'s Dep. at 109:7-110:1. Then, roughly eighteen months later, he was rushed

to the hospital because he "couldn't move [his] left side." *Id.*
106:3-10.  According to Plaintiff, doctors at the Mount Sinai
Hospital found that his spinal discs had shifted, which required
surgery. *Id.* 105:22-106:1.  Plaintiff testified that these
doctors offered him no "guarantees" that he would "survive this
operation," *id*. 106:11-21, but he did not produce any medical
records related to this procedure.  After surgery, Plaintiff
regained "partial use" of his left side, but he still suffers
persistent pain, restrictions on his mobility, and loss of other
functions. *Id.* 106:22-107:7; 113:2-114:14.  He has not,
however, presented medical or expert testimony regarding the
cause of these problems.  At his deposition, he testified that
the injuries from the van are responsible.[3] *Id.* 107:23-108:10.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows
that there is no genuine dispute as to any material fact" and
that he "is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).  A material fact is one that "can affect the
outcome under the applicable substantive law." *Graham v.
Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  A genuine dispute is
one that can "reasonably be resolved in favor of either party."

---

[3] At his deposition, Plaintiff acknowledged that he was hit by a car in
the "knees" over ten years earlier (in 2008) but recalled no other relevant
injuries. *Id.* 110:2-112:16.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   In performing this analysis, the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party.   *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).   "If, in this generous light, a material issue is found to exist, summary judgment is improper."   *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999).

The moving party may establish that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case."   *Gallo*, 22 F.3d at 1223-24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).   If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial."   *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998).   However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotations omitted).   If "no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."   *Id.* (internal quotations omitted).

## III. Analysis

Defendants move for summary judgment on all of Plaintiff's claims[4] except his challenge to the legality of the initial traffic stop and claims for negligence.  Accordingly, the Court has no reason to decide, at this stage, whether the initial traffic stop was lawful.  The only question at this point is whether Plaintiff's claims that arose after the stop survive summary judgment.

A.     The City's Liability

Because Plaintiff brings each of his Section 1983 claims against the City, the Court first considers whether municipal liability attaches here.  Governing precedent affords municipalities certain protections from Section 1983 liability, notwithstanding the merits of the underlying claims.  For the reasons explained below, this protective standard prevents Plaintiff from pressing his claims against the City.

The Supreme Court has imposed a series of requirements for establishing municipal liability under Section 1983.  Under *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694-95 (1978)*, "a local government may not be sued under [Section] 1983 for an injury inflicted solely by its employees or agents."

---

[4] Plaintiff brings claims under Section 1983 for false arrest, malicious prosecution, malicious abuse of process, unlawful search, excessive force, and deliberate indifference to medical needs; he also brings various state-law tort claims.

12

"Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983." *Id.* at 694.

Plaintiff attempts to satisfy *Monell* by alleging that New York City maintained a "custom or policy" of, among other things, "falsely stopping, frisking and arresting individuals," and "using excessive and unjustified force." Compl. ¶ 101. This is an exceptionally broad allegation, and "[w]hen a plaintiff tries to fall within *Monell* by defining the alleged 'custom or policy' as broadly as plaintiff[] ha[s] here, he takes an almost impossible burden upon himself." *Rasmussen v. City of New York,* 766 F. Supp. 2d 399, 408 (E.D.N.Y. 2011). Plaintiff attempts to meet this burden in three ways: first, he claims these practices are "so persistent and widespread that [they] constitute[] a custom through which constructive notice is imposed upon policymakers"; second, he argues that the City failed to "properly train or supervise" its police officers; and third, he claims Sergeant Farella is a "municipal official[] with decision-making authority" whose approval of the actions in this case bound the City. *See generally Moran v. Cnty. of Suffolk*, No. 11-CV-3704, 2015 WL 1321685, at *9 (E.D.N.Y. Mar.

24, 2015) (listing the bases for *Monell* liability).  These arguments are without merit.

Plaintiff has not successfully produced evidence that the alleged misconduct is "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014).  The only evidence Plaintiff presents is a list of federal and state lawsuits filed against the individual Defendants in recent years.  *See* Pl.'s Ex. R, ECF No. 54-18 ("Printouts from https://capstat.nyc/officer").  This document provides no supporting detail about the nature of those lawsuits, or whether constitutional violations were determined to have occurred.[5]  Because the record does not "show that there [was] *any* violation of constitutional rights" in these actions, "there is no evidence of the predicate fact underlying the alleged custom and policy." *Rasmussen,* 766 F. Supp. 2d at 409

---

[5] Indeed, this document is so bare that the Court cannot even locate many of the referenced cases, given the absence of docket numbers.  Those that the Court was able to find, however, involved no finding of liability against the named Defendants.  *See Pandiani v. City of New York*, 15-CV-6346, 2019 WL 5703909 (E.D.N.Y. Nov. 5, 2019) (dismissing for failure to prosecute); *Smith v. City of New York*, No. 14-CV-9069, 2016 WL 5793410 (S.D.N.Y. Sept. 30, 2016) (granting defendants' motion for summary judgment on false-arrest claim); *Cortes v. City of New York*, 148 F. Supp. 3d 248 (E.D.N.Y. 2015) (granting partial summary judgment in favor of defendants before case settled); *Walker v. City of New York*, No. 14-CV-0808, 2015 WL 4254026 (S.D.N.Y. July 14, 2015) (dismissing certain claims before case settled); *Pluma v. City of New York*, 13-CV-2017, 2016 WL 1312087 (S.D.N.Y. Mar. 31, 2016) (dismissing federal claims and subsequently declining supplemental jurisdiction over remaining state-law claims); *but see Burgess v. City of New York*, No. 15-CV-5525, 2018 WL 1581971 (E.D.N.Y. Mar. 29, 2018) (denying partial summary judgment; case is pending trial).

(noting that "[p]laintiffs seem to proceed on the assumption that if a complaint, whether administrative or by way of a civil action, is filed against an officer, it follows *ipso facto* that he is guilty of a constitutional violation"); *Collins v. City of New York,* 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (holding that a "litany of other police-misconduct cases" discussed in the plaintiff's complaint "[were] insufficient to make a plausible case for *Monell* liability" because they either were irrelevant to the misconduct alleged, post-dated such misconduct, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); *see also Forte v. City of New York*, No. 16-CV-560, 2018 WL 4681610, at *10 (S.D.N.Y. Sept. 28, 2018) (dismissing *Monell* claim based on lawsuits filed against municipality, and collecting cases finding the same).

Plaintiff's claim for failure to supervise and discipline fails for similar reasons. "It is well established that a plaintiff may [allege *Monell* claims] by showing that [the City] was deliberately indifferent to the training, supervision, or discipline of its employees." *Abreu v. City of New York*, 657 F. Supp. 2d 357, 360 (E.D.N.Y. 2009). To assert this claim, however, Plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.

15

1995).  Although an "obvious need may be demonstrated through proof of repeated complaints of civil rights violations," *id.*, Plaintiff presents "no evidence as to the municipality's response to any prior incident of misconduct," *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 79 (E.D.N.Y. 2015), let alone that the City made "no meaningful attempt . . . to investigate or to forestall further incidents."  *Vann*, 72 F.3d at 1049.

Plaintiff's failure-to-train claim, which presents an alternative route to establishing "deliberate indifference," is also without merit.  "[T]he inadequacy of police training may serve as a basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Plaintiff's claim fails because "[i]t is impossible to prevail" on such a theory "without any evidence as to . . . how the training was conducted, how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004) (internal quotations omitted).  Plaintiff has adduced no such evidence here.

Finally, the claim that Sergeant Farella is a policymaking official under *Monell* and its progeny is incorrect

16

as a matter of law.  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  "[A] police sergeant, even if the ranking officer on a matter, is not a policy maker."  *McKeefry v. Town of Bedford*, No 18-CV-10386, 2019 WL 6498312, at *5 (S.D.N.Y. Dec. 2, 2019); *Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263, 303 (S.D.N.Y. 2015) (identifying "no basis" to conclude that police sergeant had "final policymaking authority with respect to how . . . police officers were to carry out searches").  The case on which Plaintiff relies is inapposite because it involved a county sheriff and other legal and evidentiary factors absent here.  *See Jeffes v. Barnes*, 208 F.3d 49, 62-64 (2d Cir. 2000) (finding genuine dispute as to whether county sheriff was policymaking official based on evidence regarding his privileges and state-law designations of authority).

   B.   <u>Qualified Immunity</u>

        Plaintiff's only remaining Section 1983 claims are against the individual police officers.  Under Supreme Court and Second Circuit precedent, police officers are afforded broad legal protection by the doctrine of qualified immunity, which "protects government officials from suit if their conduct does not violate clearly established statutory or constitutional

17

rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotations omitted). "This is a doctrine that seeks to balance the twin facts that civil actions for damages may offer the only realistic avenue for vindication of constitutional guarantees, and that such suits nevertheless can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (internal quotations omitted).

To determine whether the doctrine applies, a court must assess: "(1) whether [a] plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez*, 728 F.3d at 154. "The objective reasonableness test is met — and the defendant is entitled to qualified immunity — if officers of reasonable competence could disagree on the legality of the defendant's actions." *Rothman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (internal quotations omitted). This standard protects "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Because the
individual Defendants have invoked qualified immunity for each
of Plaintiff's Section 1983 claims, the Court reviews the merits
of each claim through this lens.

    C.      <u>False Arrest</u>

        To succeed on a claim for false arrest under Section
1983, a plaintiff must prove that: "(1) the defendant intended
to confine the plaintiff; (2) the plaintiff was conscious of the
confinement; (3) the plaintiff did not consent to the
confinement; and (4) the confinement was not otherwise
privileged."  *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.
1994) (setting forth the elements of false arrest under state
law); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)
(stating that a false-arrest claim under Section 1983 is
"substantially the same as a claim for false arrest under New
York law").

        Probable cause is a "complete defense" to claims of
false arrest.  *See Covington v. City of New York*, 171 F.3d 117,
122 (2d Cir. 1999).  Probable cause exists "when the arresting
officer has knowledge or reasonably trustworthy information
sufficient to warrant a person of reasonable caution in the
belief that an offense has been committed by the person to be
arrested."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d
Cir. 1995) (internal quotations omitted).  Probable cause does

not require "hard certainties" but instead "requires only facts establishing the kind of fair probability on which a reasonable and prudent person, as opposed to a legal technician, would rely." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (internal quotations omitted).  "[W]here there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).  "[A]n arresting officer will . . . be entitled to qualified immunity from a suit for damages if he can establish that there was arguable probable cause to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotations omitted).

Although Plaintiff was arrested for a technical violation, it was not unreasonable to conclude — indeed, it was likely correct — that Plaintiff's actions violated the literal terms of Section 3345 of the New York Public Health Law.  This section provides that "[e]xcept for the purpose of current use by the person . . . for whom such substance was prescribed or dispensed, it shall be unlawful for an ultimate user of controlled substances to possess such substance outside of the original container in which it was dispensed."  N.Y. Pub. Health

L. § 3345.[6]  Multiple courts in this Circuit have found probable cause — or "arguable probable cause," in the qualified immunity analysis — in similar circumstances.  *See, e.g.*, *Cortes v. City of New York*, 148 F. Supp. 3d 248, 254 (E.D.N.Y. 2015) ("It cannot be denied that plaintiff literally violated the language of Public Health Law [Section] 3345 — a person cannot possess a controlled substance outside of its prescription container."); *see also Salvador v. City of New York*, 15-CV-5164, 2016 WL 2939166, at *6 (S.D.N.Y. May 19, 2016) (probable cause — "or at least arguable probable cause" — existed even though pills were in a bag next to the original container and arrestee claimed he had a valid prescription); *Deanda v. Hicks*, 137 F. Supp. 3d 543, 570-71 (S.D.N.Y. 2015) (finding probable cause "arguably" existed where plaintiff carried prescription pills in an unmarked bottle while driving to return the pills to her sister).  Where, as here, Plaintiff carried controlled substances — the twenty-one suboxone strips — in a pill bottle labeled for a different prescription drug — suboxone pills — it was at least arguable that probable cause existed for his arrest.  This defeats Plaintiff's false-arrest claim.

---

[6] Plaintiff was also charged with violating Section 220.03 of the New York Penal Law — forbidding the "knowing[] and unlawful[] possess[ion] of a controlled substance."  N.Y. Penal L. § 220.03.  Section 220.03 "effectively 'piggy-backs' on [S]ection 3345 by taking its 'unlawful[ness]' element from that statute."  *Cortes v. City of New York*, 148 F. Supp. 3d 248, 253 (E.D.N.Y. 2015).

Plaintiff argues that he is entitled to damages because "each act" taken by the Defendants after his allegedly improper traffic stop was unlawful, including the search that led to the discovery of the suboxone strips.  Pl.'s Opposition to Summary Judgment at 10-11, ECF No. 52 ("Opp.").  This is essentially a fruit-of-the-poisonous tree argument, and that doctrine has no applicability in the Section 1983 context. *Jenkins v. City of New York*, 478 F.3d 76, 91 n.16 (2d Cir. 2007) (in an action for damages under Section 1983, "the fruit of the poisonous tree doctrine cannot be invoked").  Among other things, this means that "[v]ictims of unreasonable searches or seizures" cannot press Section 1983 claims for "injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."  *Townes v. City of New* York, 176 F.3d 138, 148 (2d Cir. 1999); *see also Arroyo v. City of New York*, 683 F. App'x 73, 75 (2d Cir. 2017) (summary order) (the fact that incriminating evidence "was later suppressed does not preclude a determination that there was arguable probable cause for the arrest"); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 434 (E.D.N.Y. 2012) (for Section 1983 claims, evidence seized "pursuant to [an] allegedly unlawful traffic stop and search may" nevertheless "provide probable cause" for purposes of a false-arrest claim).  Accordingly, the Court dismisses Plaintiff's claim for false arrest.

D.       Malicious Prosecution

To prevail on a claim for malicious prosecution, a plaintiff must show that "(1) the defendant commenced or continued a criminal proceeding against the plaintiff; (2) the proceeding terminated in plaintiff's favor; (3) there was no probable cause for the criminal proceeding; and (4) defendants initiated the criminal proceeding out of actual malice." *Neal v. Fitzpatrick*, 250 F. Supp. 2d 153, 154 (E.D.N.Y. 2003). "Like a false arrest claim, 'the existence of probable cause is a complete defense to a claim of malicious prosecution in New York.'" *Johnson v. City of New York*, 18-CV-6256, 2020 WL 2732068, at *5 (E.D.N.Y. May 26, 2020) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, except that a claim for malicious prosecution must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest." *Brown v. City of New York*, 12-CV-3146, 2014 WL 5089748, at *8 (S.D.N.Y. Sept. 30, 2014) (cleaned up). Accordingly, "once probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, the groundless nature of the charge is made apparent by the discovery of some intervening fact." *Smith v.*

23

*Tobon*, 529 F. App'x 36, 38 (2d Cir. 2013) (summary order) (cleaned up).

Because probable cause at least arguably existed for the initial arrest and Plaintiff points to no "intervening fact" that emerged thereafter, his claim for malicious prosecution must be dismissed as a matter of law.

E.   Malicious Abuse of Process

"[A] malicious-abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 69-70 (cleaned up). Although "[t]he torts of malicious prosecution and abuse of process are closely allied," *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994), the difference between them

> is that in a malicious prosecution claim the process is
> issued in bad faith and without probable cause, but the
> defendant intends to bring about the ordinary result of the
> process, while in an abuse of process claim, the issuance
> of process may be regular, valid, and lawful, but the
> person using the process is interested in only
> accomplishing some improper purpose that is collateral to
> the object of the process and which offends the spirit of
> the legal proceeding itself.

14 N.Y. PRAC., NEW YORK LAW OF TORTS § 1:86.

While the existence of probable cause is not a complete defense to claims of malicious abuse of process,

Plaintiff's claim nevertheless fails because he identifies no "collateral objective that is outside the legitimate ends of the process" that the Defendants sought to gain by commencing legal action. *Savino*, 331 F.3d at 70. Though parts of the record suggest that the officers were motivated by a desire to engage with Plaintiff's "Knight Rider" car, he does not allege as much in support of his abuse-of-process claim. And even if this desire motivated the initial stop and arrest, there is no evidence that the officers facilitated his subsequent *prosecution* for this purpose. *Id*. at 77-78. For these reasons, Plaintiff's malicious-abuse-of-process claim must be dismissed.

    F.    <u>Unlawful Search</u>

        Plaintiff claims that the Defendants conducted an unlawful search of his person and car. It is undisputed that the Defendants performed these searches without a warrant and without Plaintiff's consent. Searches like these "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). But qualified immunity shields police officers who conduct warrantless searches so long as they could "reasonably have believed that the search" fit within an exception to the warrant requirement. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Among the exceptions to the warrant requirement is a search incident to a

25

lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Given the Defendants' qualified immunity, the only question is whether it was reasonable for them to believe the warrantless searches fell within the search-incident-to-arrest doctrine.

The warrantless search of Plaintiff's person satisfies this reasonableness standard. Although Officer Goyco reached into Plaintiff's pocket to retrieve the pill bottles without Plaintiff's consent, this occurred only *after* Plaintiff had voluntarily handed him the pill bottles and Officer Goyco saw suboxone strips in the container labeled for suboxone pills. Pl.'s Ex. B, Pl.'s Dep. at 52:12-19 (Plaintiff testified that when Officer Goyco first asked if he could "see" Plaintiff's prescription medications, Plaintiff replied "sure" and then "reached in [his own] pocket [and] presented [his] medication"). At that point, probable cause arguably existed to arrest Plaintiff for the reasons explained above.[7] Because of this, the law permitted Officer Goyco to conduct a "search incident" to

---

[7] Plaintiff does not argue that Officer Goyco's act of *opening* the pill bottles constituted an unreasonable search under the Fourth Amendment, even after Plaintiff voluntarily produced them. *See* Compl. ¶ 17 (two officers "entered Plaintiff's motor vehicle and conducted an unwarranted search of the interior of said vehicle"); *id.* ¶ 18 (after Officer Goyco "thrust his hand into Plaintiff's jacket," the officers "proceeded to improperly and illegally search Plaintiff's motor vehicle, again without probable cause or consent"); Opp. at 3 (same); *id.* at 10 ("There was no probable cause for . . . conducting the subject search of the plaintiff or his vehicle . . . ."); *id.* at 11 ("The search of the plaintiff's person and vehicle were unlawful as was the stop that resulted in that search."). Therefore the Court does not address that issue.

that arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973). The law is clear that such searches "require[] no additional justification." *Id*. This exception to the warrant requirement applies even if the search occurred moments before Officer Goyco initiated the arrest, as Plaintiff's deposition testimony might suggest; where an officer "clearly ha[s] probable cause" to arrest a suspect, a search "incident to" that arrest may shortly precede the arrest, as well as follow it. *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.").

Likewise, the Defendants were not "plainly incompetent" in concluding that the warrantless search of Plaintiff's *car* was lawful. *Malley*, 475 U.S. at 341. Supreme Court precedent permits police officers to conduct warrantless searches of vehicles in certain situations. Specifically, in *Arizona v. Gant*, the Court "adopted a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" *Davis v. United States*, 564

U.S. 229, 234-35 (2011).  This exception to the warrant requirement exists "even after the arrestee has been secured and cannot access the interior of the vehicle."  *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 611 (S.D.N.Y. 2013).

While there is no dispute that the first prong of *Gant* (access to the vehicle) is inapplicable, "officers of reasonable competence could disagree" as to whether the second exception applies here.  *Malley*, 475 U.S. at 341.  Indeed, some courts have opined that arrests for drug offenses *automatically* allow officers to search the arrestee's vehicle so long as the arrestee recently occupied it.[8]  *See Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring) (following an arrest for a drug offense, it is "reasonable [for police officers] to believe that further contraband or similar evidence relevant to the crime for which [the arrestee] had been arrested might be found in the vehicle from which he had just alighted and which was still within his vicinity at the time of arrest"); *United States v. Mitchell*, No. 16-10112, 2017 WL 552732, at *9 (D. Kan. Feb. 10, 2017) (after finding drugs in the defendant's

---

[8] It bears noting that the search of Plaintiff's coat pocket also revealed he had concealed a bottle of Xanax — a second substance — when handing his medications to Officer Goyco for inspection.  Pl.'s Ex. L at 3, ECF No. 54-12 ("NYPD Prisoner Property Receipt") (listing thirty alprazolam tablets); Pl.'s Ex. F, Misdemeanor Complaint and Supporting Deposition at 2 (stating that Plaintiff possessed "buprenorphine," "naloxone," and "alprazolam," with the latter found through a "search incident to lawful[] arrest in coat pocket"); Pl.'s Ex. B, Pl.'s Dep. at 99:4-15 (acknowledging that he was in possession of prescription Xanax that day).

pocket following a traffic stop, it was "reasonable to believe
evidence relevant to the possession of a controlled substance
crime might be found in the vehicle"); *United States v. Stone*,
No. 1:08-CR-32-R, 2009 WL 2447926, at *3 (W.D. Ky. Aug. 7, 2009)
("It is reasonable for an officer to believe that a person
lawfully arrested for a drug offense may have further contraband
or similar evidence relevant to the crime in the vehicle from
which he just exited."). And courts in this Circuit have
extended qualified immunity to officers who conduct vehicle
searches without any concrete reason to believe contraband would
be found in the car. *See Quiles v. City of New York*, No. 15-CV-
1055, 2016 WL 6084078, at *9-*10 (S.D.N.Y. Oct. 12, 2016)
(finding "arguable probable cause" existed to search vehicle
where arrestee reported he had "hypodermic needles in his
possession" and "was on his way to a drug detoxification
program," even though officers had not seen any contraband in
the vehicle). Given these precedents, it cannot be said that no
reasonable officer could have believed the search of Plaintiff's
car was lawful, including the search of the "glove compartment
and center console." Compl. ¶ 17.

  For the same reasons as in Plaintiff's false-arrest
and malicious-prosecution claims, the alleged illegality of the
initial stop is of no moment here. *Cf. Baksh v. City of New
York*, 15-CV-7065, 2018 WL 1701940, at *6 (E.D.N.Y. Mar. 31,

2018) (claim that "search was unlawful because it followed an allegedly unlawful traffic stop" "relies on a 'fruit of the poisonous tree' theory that is not cognizable under [Section] 1983"). Defendants' motion is therefore granted with respect to these warrantless searches.

G.     <u>Excessive Force</u>

Plaintiff claims his "rough ride" to the precinct constituted excessive force. To survive summary judgment on an excessive force claim, a plaintiff must demonstrate the force used in the arrest was "excessive" under the Fourth Amendment. *See Smith v. P.O. Canine Dog Chas,* No. 02 6240, 2004 WL 2202564, at *13 (S.D.N.Y. Sept. 28, 2004). Police officers' application of force is excessive under the Fourth Amendment "if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004) (internal quotations omitted).

Here, Plaintiff contends that the excessive force arose from the officers' "negligent[], wanton[] and intentional[] fail[ure] to prevent . . . the excessive use of force and brutality," Compl. ¶¶ 89-90, by driving "aggressively" without providing a functional seatbelt. Specifically, he alleges that he "was tossed about for an unreasonably long period of time and transported in an unsafe manner that was

carried out either intentionally or negligently." *Id*. ¶ 16. The van "was continuously and roughly/violently driven" for a total of "roughly [three] hours," *id*. ¶ 32, and he was kept in the van for an "excessive length of time and without any justification," *id*. ¶ 33; the van ride reflected "mishandling" on the part of the officers, *id*. ¶ 51; he "was physically abused" during that time, *id.* ¶ 91; and he "was inadequately secured" and "tossed about violently," Opp. at 2.  At his deposition, Plaintiff testified that the officers drove "aggressively," and at some points "really, really aggressively," Pl.'s Ex. B, Pl.'s Dep. at 73:22-74:4; he also stated that the seatbelt in the van was merely for "cosmetics," providing "no tension," *id.* 66:19-22, and that the officers "busted a fast U-turn," which sent him "flying," *id.* 74:20-75:12.

Because Defendants have invoked qualified immunity, the critical question is whether they should reasonably have known that their conduct in the van violated "clearly established" constitutional law.  "[W]hile both the excessive force inquiry and the qualified immunity inquiry ask whether the officer's actions were 'objectively reasonable,' the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017).  "The dispositive question is

31

whether the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations omitted).  Though this standard does not require "a case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

This standard poses a challenge here, given the scarcity of cases addressing excessive-force claims in this context.  Plaintiff points to no precedent that clearly forbids Defendants' conduct, and this Court is aware of none.  If anything, the law in this Circuit tends to support the conclusion that Defendants' conduct was lawful.  This precedent establishes that there is no constitutional right to "non-negligent driving by government employees," *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004) (dismissing claim based on car accident), or even to a seatbelt, *Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012) (regarding prisoners).  Relying on these precedents, another judge in this District recently dismissed a (somewhat) similar excessive-force claim on the grounds that it did not raise constitutional issues, but rather sounded in negligence.  *See Lopez v. City of New York*, 15-CV-7292, 2018 WL 2744705, at *8 (E.D.N.Y. June 7, 2018) (plaintiff alleged that police officers used excessive

force by rapidly accelerating their police van without first buckling her seatbelt).

Given the similarities between these cases and the one at bar, it cannot be said that a reasonable officer in Defendants' position would have known that they were violating clearly established law.  Plaintiff does not assert that the officers drove at excessive speeds or engaged in any specific dangerous maneuvers.  And he speculated that the reason for Defendants' "aggressive" driving was that they were pursuing other suspects, rather than endeavoring to cause injury.  Pl.'s Ex. B, Pl.'s Dep. at 87:8-12 (explaining that he "tipped over" "because [the officers] were trying, I guess, . . . to catch other people"); *see also* Defs' Ex. A, November 17, 2016 Medical Records at 2 (Plaintiff reported that "four days ago he was arrested . . . and placed in the back of [a] police car" where the drivers were "chasing after several perpetrators" and that "as a result he was tumbling back and forth in the back of the car").  This suggests the officers were performing ordinary police duties, which undermines the inference that reasonable officers would have known their actions were unlawful.

And though the initial ride was long, Plaintiff does not dispute the Defendants' assertion that these officers "typically" continue their scheduled patrol even after detaining arrestees in their vehicle for similar lengths of time.  Defs'

Ex. G, Setteducato Dep. at 21:22-25 ("[T]ypically we stay out
with the van until we are done conducting enforcement . . . .");
*id.* 45:5-19 (stating that there was no "specific reason" why
Plaintiff remained in the van and explaining, "That's just how
we operate.  We go out.  We do enforcement for a period of time.
The prisoner van is a secure location to hold the prisoners
until we're done, and they're transported to the precinct for
processing" — and confirming that it is "common to keep a
prisoner in the back of the van for more than three hours").
This, too, supports the conclusion that reasonable police
officers would not have believed the van ride was unlawful.

For these reasons, Plaintiff's excessive-force claim
cannot surmount the Defendants' qualified-immunity defense.  As
noted above, the law of qualified immunity, as handed down by
the Supreme Court, protects "all but the plainly incompetent or
those who knowingly violate the law."  *Malley*, 475 U.S. at 341.
In this case, the record establishes that the officers' conduct
fell into neither of these categories.  Defendants' motion is
therefore granted as to Plaintiff's excessive-force claim.

H.    Deliberate Indifference to Medical Needs

Plaintiff's deposition testimony regarding the number
of times he raised medical concerns — and what he told the

34

officers — is muddled at best.[9]  Reading his testimony "in the
light most favorable to the party against which summary judgment
is contemplated," *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
537 F.3d 168, 178 (2d Cir. 2008), the Court assumes that
Plaintiff expressed concern about his medical wellbeing multiple
times that night.  Defendants, it is assumed, ignored each of
these statements, except his initial request for blood pressure
medication in the van.  The Court also assumes that Plaintiff,
when making each statement, was concerned about his van injuries
or blood pressure, not his "heart issues," "throat cancer,"
"anxiety," or "back injury," Compl. ¶ 47, because he alludes to
these other conditions only obliquely, if at all, in his
testimony.  Pl.'s Ex. B, Pl.'s Dep. at 90:20-91:5 (the source of
his concern was his "blood pressure," because he "didn't have
access to [his] medication," and "the [van] injury").  Although

---

[9] Plaintiff claims that he asked for medical attention "a total of three
times in the care of [Defendants]" and "once in the care of whoever" was
present at the second precinct where he stayed overnight.  Pl.'s Ex. B, Pl.'s
Dep. at 88:14-17.  First, he requested "blood pressure medicine" in the car
(which Defendants provided), *id.* 71:6-25; 89:11-19; second, he told
Defendants "something's not right" and that he "d[idn't] feel right" after
falling in the van, *id.* 77:12-78:6; 78:16-21; *but see id.* 91:11-14 ("the
second time" he asked for medical assistance "was after I tipped over, after
they gave me the medication at the 121st Precinct"); third, he requested
unspecified medical assistance either at the first precinct, *id.* 88:20-89:9
(requesting medical assistance "at the 121"), en route to the second
precinct, *id.* 91:15-19 ("the third time" he asked for medical assistance "was
on the way to the 120th Precinct"), or after arriving at the second precinct,
*id.* 90:8-10 (requesting assistance "when we were in the 120, but not in the
van"); and finally, he "yelled out" to an unidentified person at the second
precinct, "Could I please have some medical attention? I don't feel well,"
*id.* 90:12-14.

the Court assumes these conditions were the source of
Plaintiff's concerns, the record does not clearly demonstrate
that he communicated this fact to the officers on any occasion
on which they ignored him.  Instead, his statements were more
vague.  *Id.* 78:3-8 (he told the officers "multiple times that
night" that "something's not right.  I don't feel right."); *id.*
90:12-14 (telling unidentified officer at the second precinct,
"Could I please have some medical attention? I don't feel
well.").

       "A pretrial detainee may establish a [Section] 1983
claim for allegedly unconstitutional conditions of confinement
by showing that the officers acted with deliberate indifference
to the challenged conditions" under the Fourteenth Amendment.
*Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  This means
that a pretrial detainee must satisfy two prongs to state a
claim: "an 'objective prong' showing that the challenged
conditions were sufficiently serious to constitute objective
deprivations of the right to due process, and a 'subjective
prong' . . .  showing that the officer acted with at least
deliberate indifference to the challenged conditions."  *Id.*
(noting that a detainee's rights under due process are "at least
as great as the Eighth Amendment protections available to a
convicted prisoner").

With respect to medical ailments specifically, "a pretrial-detainee plaintiff must show that she had a serious medical condition and that it was met with deliberate indifference." *Dollard v. City of New York*, 408 F. Supp. 3d 231, 236 (E.D.N.Y. 2019) (internal quotations omitted). "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will cause the prisoner." *Salahuddin v. Goord*, 467 F. 3d 263, 280 (2d Cir. 2006).

Plaintiff's injuries from the van do not satisfy the first, "objective" prong of this test. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id*. This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), though a plaintiff need not "demonstrate that he or she experiences pain that is at the limit of human ability to bear," or that "his or her condition will degenerate into a life-threatening one" without treatment. *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003). Here, the only diagnosis on the record is a "right shoulder injury[,] possibly a rotator cuff tear and right wrist sprain." Defs' Ex. A, November 17, 2016 Medical Records at 2. The doctors gave

Plaintiff a "carpal tunnel brace" for his wrist and suggested
physical therapy for his shoulder, but prescribed no medication.
*Id.* These injuries do not meet the definition of a "condition
of urgency." *See Scalpi v. Town of E. Fishkill*, 14-CV-2126,
2016 WL 858916, at *10 n.13 (S.D.N.Y. Feb. 29, 2016) (a "tear or
sprain" in the shoulder is not a "sufficiently serious" injury);
*Alster v. Goord*, 745 F. Supp. 2d 317, 337 (S.D.N.Y. 2010)
(injury to plaintiff's arm was not "sufficiently serious"
because there were no "fractures or dislocation"); *Covington v.
Westchester Cnty. Dep't of Corr.*, No. 06-CV-5369, 2010 WL
572125, at *7 (S.D.N.Y. Jan. 25, 2010) ("muscle sprains" are not
"sufficiently serious").[10]

        As for Plaintiff's request for assistance with his
blood pressure, these pleas were not met with deliberate
indifference.  Deliberate indifference requires a showing that
the Defendants "acted intentionally to impose the alleged
condition, or recklessly failed to act with reasonable care to

_____

        [10] Although Plaintiff claims these injuries caused serious complications
later on, he does not squarely allege that immediate intervention would have
changed this outcome. *See, e.g.*, *Sereika v. Patel*, 411 F. Supp. 2d 397, 406
(S.D.N.Y. 2006) (denying summary judgment where plaintiff alleged that delay
in treating shoulder injury caused serious impediments and pain later).  Even
if Plaintiff made this argument, he submits no medical evidence tying his
later injuries to the original inadequacy in treatment.  *Cf. Spiegel v.
Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) (plaintiff's testimony that his
medical condition prevented him from losing weight was insufficient to
withstand a motion for summary judgment in the absence of "competent medical
evidence confirming that connection"); *see also Fuller v. Lantz*, 549 F. App'x
18, 21 (2d Cir. 2013) (summary order) (affirming summary judgment on
deliberate-indifference claim where medical diagnosis was supported only by
"lay statements" in affidavits).

mitigate the risk that the condition posed," even though they
"knew, or should have known, that the condition posed an
excessive risk to health or safety."  *See Darnell*, 849 F.3d at
35.  The record shows that Plaintiff requested his blood
pressure medication only once, and Defendants administered it
when he did.  The record does not indicate that he asked for his
medication again, or that he otherwise alerted Defendants to
concerns about his blood pressure (or any other specific medical
issues) thereafter.  Plaintiff's deposition testimony also
appears to acknowledge that the Defendants actually administered
a second round of blood pressure medication at the first
precinct.  Pl.'s Ex. B, Pl.'s Dep. at 91:11-14 (testifying that
the second time he asked for help was "after I tipped over [in
the van], after they gave me the medication at the 121st
Precinct").  Because there is no evidence that the Defendants
knew Plaintiff wanted his blood pressure medicine when they
ignored his pleas, they were not deliberately indifferent to
this medical need.  *Cf. Araujo v. City of New York*, No. 08-CV-
3715, 2010 WL 1049583, at *8 (E.D.N.Y. Mar. 19, 2010)
(dismissing deliberate-indifference claim because plaintiff did
not "request[] immediate emergency care" or "inform[]" any
officials "that he had a serious medical condition"); *Graham v.
Coughlin*, No. 86-CV-163, 2000 WL 1473723, at *5 (S.D.N.Y. Sept.

29, 2000) (same, because plaintiff "did not alert defendants to any health problems").

Even assuming the Defendants ignored one or more additional requests for blood pressure medication, "[b]oth the Second Circuit and numerous district courts within it have found that missing a single dose or even several doses of medicine is generally not actionable, even where the effect of missing a single dose is far more severe than plaintiff claims to have experienced here." *Constantino v. DiStefano*, No. 18-CV-5730, 2020 WL 353094, at *5 (E.D.N.Y. Jan. 21, 2020). Being deprived of blood pressure medication for less than twenty hours[11] does not violate the Constitution — at least where, as here, no lasting health consequences arose. *Compare Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (dismissing deliberate-indifference claim based on "a delay of several days in dispensing plaintiff's hypertension medication" absent evidence that "the delay gave rise to a significant risk of serious harm"); *Torres v. Trombly*, 421 F. Supp. 2d 527, 532-33 (D. Conn. 2006) (prison nurse's failure to administer hypertension medicine for one day did not cause plaintiff to suffer a serious

---

[11] Plaintiff was arrested at approximately 5:00 p.m., Pl.'s Ex. G at 1, ECF No. 54-7 ("Post-Tactical Plan"), and released the next day after his 12:34 p.m. arraignment, Defs' Ex. N at 1, ECF No. 50-14 ("NYPD Online Prisoner Arraignment Form"). This is less than twenty hours in custody. He received medication at some point before arriving to the first precinct around 8:10 p.m. *See* Pl.'s Ex. G, Post-Tactical Plan at 1.

medical condition), *with Lozada v. City of New York*, No. 12-CV-
0038, 2013 WL 3934998, at *6 (E.D.N.Y. July 29, 2013) (plaintiff
sufficiently pled deliberate indifference where van drivers
ignored detainee's repeated requests to use the restroom for his
high blood pressure, laughed and mocked him, and then stopped
the van to use the bathroom themselves, for a total of four
hours before plaintiff wound up in the emergency room).
Plaintiff's claim for deliberate indifference to medical needs
is dismissed.

     I.    <u>Unlawful Stop</u>

        Because Plaintiff's only remaining Section 1983 claim
is for the initial stop, the Court must determine whether this
claim will proceed against some or all the named officers.
Section 1983 claims may proceed only against those who are
"personal[ly] involv[ed]" in the underlying violation. *Wright
v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Here, different
officers were involved at different stages of the process — the
stop and arrest, the van ride, and the prosecution. There is no
evidence that anyone besides Officers Vaccarino and Goyco
"direct[ly] participat[ed]" in the initial stop, *Black v.
Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996), or knew about it
beforehand, *cf. Demosthene v. City of New York*, No. 14-CV-816,
2018 WL 10072931, at *6 (E.D.N.Y. July 20, 2018) ("A failure-to-
intervene claim requires that a defendant had a reasonable

opportunity to prevent the harm."). Although Sergeant Farella was their supervisor, Plaintiff presents no evidence that he either "created a policy or custom under which unconstitutional practices occurred" or "was grossly negligent in supervising" his subordinates. *Colon v. Coughlin*, 58 F.3d 868, 873 (2d Cir. 1995) (listing bases for establishing personal involvement of "supervisory defendant[s]" under Section 1983). Accordingly, Defendants' motion is granted with respect to all individual Defendants save Officers Vaccarino and Goyco, because only they had the requisite degree of involvement in the initial stop.

J.      State-Law Claims

        Plaintiff also asserts several state-law claims, none of which are accompanied by sufficient record evidence to survive summary judgment. His civil assault and battery claims arising from the van ride fail because he cites no evidence that Defendants "intentional[ly] plac[ed]" him "in fear of imminent harmful or offensive contact" (assault) or that they made "intentional wrongful physical contact" with him "without his consent" (battery). *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006). Plaintiff's claim for negligent hiring and training against the City fails because he presents insufficient evidence that "the [City] knew or should have known of the employee's propensity for the conduct which caused the injury," *Bouche v. City of Mt. Vernon,* No. 11-CV-5246, 2012 WL 987592, at

*9 (S.D.N.Y. Mar. 23, 2012), or that the Defendants were "acting outside the scope of [their] employment," see Jacquez ex rel. Pub. Adm'r of Bronx Cnty. v. City of New York, No. 10-CV-2881, 2014 WL 2696567, at *7 (S.D.N.Y. June 9, 2014).  As for his infliction of emotional distress claims, "because the complained-of conduct here falls within the scope of claims of unreasonable search and seizure, false arrest, and malicious prosecution, a cause of action for [intentional infliction of emotional distress] or [negligent infliction of emotional distress] is unavailing." Cabrera v. City of New York, No. 16-CV-1098, 2017 WL 6040011, at *11 (S.D.N.Y. Dec. 4, 2017).

      *     *     *     *     *

Because Defendants do not seek summary judgment on Plaintiff's claims for negligence or the initial traffic stop at this stage, the Court does not pass on them.  Accordingly, all Defendants remain in this action, either in defense of Plaintiff's remaining Section 1983 claim for the initial stop (Officers Vaccarino and Goyco), or his negligence claims (all Defendants).

### III. Conclusion

For the reasons set forth above, Defendants' motion for partial summary judgment is granted in its entirety.


SO ORDERED.

/s Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:      January 7, 2021
            Brooklyn, New York